FADA GOBINS, PETITIONER, v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 26572. Promulgated September 29, 1952.

*Norman Elkington, Esq.*, for the petitioner.
*Charles W. Nyquist, Esq.*, for the respondent.

OPINION.

TURNER, *Judge:* Pursuant to the provisions of section 311 of the Internal Revenue Code,[2] the respondent has determined that petitioner was transferee of property of Kay Jelwan and, as such transferee, is liable in an amount equal to the deficiency in income tax determined against Jelwan for 1948, the addition thereto for fraud, and interest. The petitioner in this proceeding contests both the determination of the deficiency and fraud penalty against Jelwan and the determination of transferee liability therefor against her. Under section 1119 of the Internal Revenue Code, the burden of proof in such proceeding is upon the respondent "to show that a petitioner is liable as a transferee of property of a taxpayer, but not to show that the taxpayer was liable for the tax."

In his income tax return for 1948, Jelwan reported a net loss of $5,081.33. He did not report any of the gain realized from the sale of the house and furnishings at 98 Estero Avenue, nor income from any source other than the operation of Wonderland. In his determination of deficiency, the respondent increased Jelwan's income by $71,203.92, as representing bank deposits from undisclosed and unexplained sources made by or for Jelwan in his various bank accounts in 1948. The record discloses total deposits in that year of $171,715.70. Of that amount, $90,293.06 represented transfers between bank accounts, leaving $81,422.01 to be accounted for. Of this latter amount, $5,713 represented proceeds from Series E war bonds belonging to Jelwan in a prior year, and $28,709.01 represented the proceeds from the sale of the Estero Avenue property, leaving bank deposits still unexplained in the amount of $47,000. Of the deposits covering the proceeds from the sale of the Estero Avenue property, $8,354.50 represents the amount of taxable capital gain realized on the transaction. While

---

[2] SEC. 311. TRANSFERRED ASSETS.

(a) METHOD OF COLLECTION.—The amounts of the following liabilities shall, except as hereinafter in this section provided, be assessed, collected, and paid in the same manner and subject to the same provisions and limitations as in the case of a deficiency in a tax imposed by this chapter (including the provisions in case of delinquency in payment after notice and demand, the provisions authorizing distraint and proceedings in court for collection, and the provisions prohibiting claims and suits for refunds) :

(1) TRANSFEREES.—The liability, at law or in equity, of a transferee of property of a taxpayer, in respect of the tax (including interest, additional amounts, and additions to the tax provided by law) imposed upon the taxpayer by this chapter.

the petitioner did testify that according to her knowledge Jelwan had no business operations or sources of income other than Wonderland, it is not disputed that he did have in 1948 bank deposits from unexplained and undisclosed sources in the amount of $47,000. There is some suggestion or argument that $20,000 of the amount having been deposited by Alex Massad in the Jelwan-Massad joint account, the $20,000 so deposited did, or may have, belonged to Massad. The proof shows that 15 days later $20,650 was transfered from the Jelwan-Massad account, $2,650 to the Najeeb J. Jelwan checking account and $18,000 to the Najeeb J. Jelwan Savings Account No. 6477. The proof further shows that Jelwan was given an opportunity to explain or disclose the source of the deposits in question, but made no effort to do so. It also appears that in Jelwan's presence his accountant stated that, except for the fact that his records indicated unexplained bank deposits in a greater amount, his data was in accord with that of the revenue agent.

The respondent's determination is presumed to be correct, and bank deposits from unexplained and undisclosed sources supply an adequate basis for such determination. *Goe* v. *Commissioner* (C. A. 3), 198 F. 2d 851. See also *Halle* v. *Commissioner*, 175 F. 2d 500, affirming 7 T. C. 245; *Hague* v. *Commissioner*, 132 F. 2d 775, affirming 45 B. T. A. 104; *Hoefle* v. *Commissioner*, 114 F. 2d 713; and *Leonard B. Willits*, 36 B. T. A. 294.

The reduction of unexplained bank deposits from $71,203.92, added to income in determining the deficiency, to $47,000, now shown of record, came about by concessions made by counsel for the respondent at the time and in the course of the trial herein. In preparing for trial, counsel caused a revenue agent to be assigned to further check and verify the evidence at hand and to obtain any other pertinent information that might be had. In the course of his investigation, the agent succeeded in further identifying Jelwan's 1948 deposits, thereby reducing the unexplained deposits to $47,000, as above set forth. Part of the deposits were identified as proceeds of the sale of the Estero Avenue property, of which $8,354.50 represented the amount of taxable capital gain realized by Jelwan on the sale. He also discovered that during 1948 Jelwan had expended $4,624.42 for medical expenses of the type deductible under the provisions of section 23 (x) of the Internal Revenue Code, for the deduction of which no claim had been made.

It is the contention of counsel for the petitioner that, by reason of these concessions at or in the course of the trial, the burden of proof as to the correctness of the deficiency has shifted from the petitioner to the respondent. The contention is wholly devoid of merit. The concessions made by counsel were not only in the interest of orderly pro-

cedure, but they relieved petitioner of a substantial portion of her burden of proof and this court of what could have been an even longer and more burdensome trial. His action was in keeping with his duty as a lawyer and officer of the Court. To rule with petitioner, would be to say that counsel, whether for respondent or petitioner, who, by concession or stipulation of pertinant facts, relieves opposing counsel of a portion of his burden of proof and the Court of needless labor, does so at the jeopardy of having the burden of the opposing party as to remaining matters shift to himself. Justice and common sense would countenance no such rule.

On the facts as they appear of record, the deficiency in Jelwan's income tax for 1948 is $15,194.36, and has been so found in our findings of fact. With respect to the fraud issue, we have concluded, and found as a fact, that the deficiency was due to fraud with intent to evade tax, and, in that connection, there is no need to again discuss the matter covered above in connection with the determination of the deficiency, which facts, along with other evidence of record, amply sustain the respondent's determination that the deficiency was due to fraud with intent to evade tax. See *Goe* v. *Commissioner, supra.* The addition to tax determined by the respondent, pursuant to the provisions of section 293 (b) of the Code, to the extent of 50 per cent of the above deficiency, is accordingly sustained.

On the transferee issue, the evidence of record discloses that the transfers by Jelwan to petitioner were made in fraud of creditors and in partial consideration for petitioner's executory promise to pay his future living expenses, and, by reason of the transfers so made, Jelwan was rendered insolvent. That petitioner thus became liable "at law or in equity" as transferee of Jelwan's property, does not in our opinion require discussion or amplification. For a case where the consideration for the transfers was the promise of future support, and the determination of transferee liability was sustained, see *Margaret Wilson Baker*, 30 B. T. A. 188. Having shown that petitioner did become so liable, the respondent has made a prima facie case of transferee liability and the burden of going forward shifted to petitioner, and unless the prima facie case so made is answered or rebutted by petitioner, the respondent must be regarded as having borne his burden of proof. *Hutton* v. *Commissioner*, 59 F. 2d 66, affirming 21 B. T. A. 101. To the same effect, see *Robinette* v. *Commissioner*, 139 F. 2d 285; *Commissioner* v. *Renyx*, 66 F. 2d 260; *Estate of L. E. McKnight*, 8 T. C. 871; *Margaret Wilson Baker, supra; H. W. Trout*, 27 B. T. A. 1210; and *Edward H. Garcin*, 22 B. T. A. 1027.

For refutation of the case so made by the respondent, petitioner relies on her own testimony, certain canceled checks, various bills, invoices and other writings and, to a more limited extent, on the testi-

mony of other witnesses, as showing that the transfers were, in part, payment of money owing by Jelwan to her; that the transfers were also made in consideration of her promise of future support and that she actually did expend $13,362.71 therefor, and to that extent the consideration was adequate and relieved her of any transferee liability which may have arisen with respect thereto; that she also paid for Jelwan's benefit from the money received $5,609.88, to cover taxes, attorneys' fees and payments to Wonderland; and that she thereafter paid, turned over or retransferred to Jelwan United States bonds, the Cadillac sedan, the furniture and furnishings from the basement apartment in her home, proceeds from the sale of Wonderland, and cash, amounting in the aggregate to $31,100, all to the end that she received and retained no property from Jelwan which would supply a basis, at law or in equity, for transferee liability on her part in respect of any income tax, fraud penalty, and interest found to be due and owing by Jelwan.

In addition to the testimony given by petitioner at the trial herein, there are of record copies of her answer to the complaint in the Jelwan litigation, her cross complaint, both subscribed and sworn to by her, and her deposition given on August 17, 1949, in preparation for trial of the said suit. The allegations in these pleadings and the testimony so given by deposition vary greatly from much of her testimony here, and in numerous instances are in direct contradiction. In fact, her testimony at the trial herein was that much of the matter stated under oath in connection with the Jelwan litigation was not true. Her explanation of such admitted disregard of her oath was that the litigation there was between herself and another individual and she was fighting back, while in this proceeding where the United States is a party the situation is wholly different and, for that reason, her testimony here should be accepted as true. Even in that statement there is contradiction of record, it being noted that the copies of the above pleadings, together with a new covering affidavit to the effect that the allegations were true of her own knowledge, were submitted to the Bureau of Internal Revenue under date of December 6, 1949, in denial of the transferee liability asserted by the respondent and now here for determination. For reasons thus appearing, and on the basis of impressions made by her while testifying at the trial herein, we are unable to give credence to her testimony except when corroborated by other evidence or where it was in the nature of admissions against interest.

In support of her testimony as to the amounts expended in constructing and furnishing the apartment for Jelwan, the petitioner has placed in evidence canceled checks, amounting in the aggregate to $7,580.78, and sales slips and invoices, in a total amount of $647.93. While some of the amounts covered by the checks, sales slips, and

invoices were undoubtedly used for the purposes stated, and, to some extent, do corroborate the petitioner's oral testimony as to use of part of the money received from Jelwan, it is apparent that all of the amounts covered thereby were not so expended. For one thing, there were duplications between the canceled checks and the sales slips and invoices. In addition, one of the checks appears to have been in payment of the premium on an insurance policy, presumably on petitioner's home. Furthermore, there is no way of connecting various checks and sales slips with the apartment and its furnishings, except by petitioner's oral testimony. Being convinced that some fairly substantial amount was so expended by petitioner, we have arrived at $5,500 as being in our best judgment the amount shown by the evidence to have been expended. *Cohan* v. *Commissioner*, 39 F. 2d 540. Of that amount, we have concluded that $1,500 covered furniture and furnishings. One of the difficulties in fixing the amount expended for furniture and furnishings was that it was not possible to determine with respect to some expenditures what amounts were attributable to movables and what amounts were for items which were attached to and became a part of the premises. Furthermore, despite petitioner's denials, we are not convinced that all of the expenditures were for Jelwan and none for petitioner's own account. To the contrary, we have concluded, and found as a fact, that the conversion of the garage in the basement of her home into an apartment, consisting of a living or "rumpus" room, bedroom, bath and kitchen, enhanced the value of her home in the amount of $1,500. Similarly, following the rule in the *Cohan* case, we have concluded, and found, that petitioner also expended in Jelwan's behalf $1,400 to cover nursing fees, food for the nurse and Jelwan, spending money for Jelwan, and other incidentals. As to hospital and ambulance fees, doctors' fees, attorneys' fees, repayment of a loan to a third party, and taxes paid for Jelwan, we have accepted the canceled checks as proof of the amounts so expended.

As in case of the expenditures made in Jelwan's behalf covered in the preceding paragraph, the retransfers found by us to have been made by petitioner to him also fall substantially short of the amount claimed. We have satisfied ourselves and found from evidence of record that on some date prior to August 3, 1949, possibly in July, petitioner delivered to Jelwan United States Savings bonds which had cost $7,500 and had been issued in his name. By the instrument executed under date of October 22, 1949, in settlement of the suit instituted by Jelwan against her, petitioner assigned and transferred the Cadillac sedan, additional United States Savings bonds which likewise had cost $7,500, the furniture and furnishings from the basement apartment and the proceeds from the sale of Wonderland, and we have so found.

1172

We do not know, however, that Jelwan at any time actually received any part of the Wonderland sale proceeds. The sale was made in July 1949 for $13,000, of which $3,000 was applied immediately in payment of back rent, while the remaining $10,000 was placed in escrow for the payment of Wonderland's debts. What amount, if any, remained after the debts were paid is not shown.

We have been unable to find that the petitioner returned any amount to Jelwan in cash, or that any part of the money received from him was received in payment of a $3,700 balance of a prior loan to him or for salary owing for services rendered to Wonderland. Her claim that, in addition to the bonds and other property set forth above, she also returned $3,000 in cash to Jelwan in settlement of their litigation is wholly uncorroborated and, for reasons already stated, has been rejected. As to her claim that Jelwan was indebted to her, it is true that the books of Wonderland did show that the business was indebted to her in 1948 and that the balance thereof per books at December 31, 1948, was $3,700. It is further shown of record, however, that even before the transfer of the business to her on December 10, 1948, petitioner had substantial control thereof. She had equal power with Jelwan to draw checks on its bank account, had been in charge during Jelwan's sojourns in the hospital and, from and after the transfer, and until its sale, she operated the business as her own. It does appear that between February 17, 1949, and May 17, 1949, petitioner did draw checks on her own bank account payable to Wonderland, aggregating $3,150, of which two checks, totaling $2,500, were deposited in Wonderland's bank account. Except, however, for some uncorroborated general statements made by petitioner in the course of her testimony, there is nothing of record as to the operations of Wonderland in 1949 and prior to its sale in July of that year. Beyond the above deposits of $2,500, we do not know what came into Wonderland nor what went out, whether to petitioner or to others. Such being the state of the record, the claims and contentions of petitioner with respect to Wonderland must be rejected.

Our conclusions and findings as to the use and disposition of the cash transferred to petitioner by Jelwan may be summarized as follows:

| | | |
|---|---|---|
| Cash received | | $45,618.09 |
| Returned to Jelwan: | | |
| U. S. Savings Bonds, at cost (delivered prior to August 31, 1949) | $7,500.00 | |
| U. S. Savings Bonds, at cost (transferred in October 1949, in settlement of suit) | 7,500.00 | |
| Furniture and Furnishings, at cost | 1,500.00 | |
| | | 16,500.00 |
| | | $29,118.09 |

Expended in Jelwan's behalf:

| | | |
|---|---|---|
| Cost of construction of apartment, less $1,500, the amount by which the value of petitioner's property was increased | $2,500.00 | |
| Hospital, ambulance, doctors' and attorneys' fees, repayment of loan and taxes | 2,960.88 | |
| Miscellaneous, including nursing fees, food for nurse and Jelwan, spending money for Jelwan and other incidentals | 1,400.00 | |
| | | $6,860.88 |
| Received and retained by petitioner | | $22,257.21 |

One of the arguments advanced by petitioner is that by and through the retransfers made by her Jelwan's solvency was restored and, by reason thereof, she was relieved of any liability she may have had theretofore as transferee of his property; and further, that it was incumbent on the respondent to show that Jelwan was insolvent on January 5, 1950, when the notice of transferee liability was mailed to her. The short answer is that petitioner has not shown that Jelwan's solvency was so restored. To the contrary, the evidence, in our opinion, shows that by reason of the transfers made to petitioner Jelwan was insolvent at all times from and after January 3, 1949, and we have so found.

Petitioner's liability as transferee of Jelwan's property up to $22,257.21 follows from our conclusions and findings of fact to the effect that she received and retained that amount for her own benefit, and as to her liability in that amount, no further discussion is required.

The question remaining is whether she is relieved of liability as to the amounts expended in Jelwan's behalf and the amounts returned to him. By section 3439.04 of the California Civil Code, it is provided that "Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation incurred without a fair consideration." Section 3439.07 of the code is to the effect that "Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors." Petitioner argues, however, that the return of money and property to Jelwan purged the transaction of fraud to the extent of the property so returned, and further, that a transaction in consideration of future support is valid as against creditors to the extent of the support actually furnished pursuant thereto.

In support of the latter proposition above, the petitioner quotes from 37 Corpus Juris, Secundum, 971, and cites and relies on *First National Bank* v. *Smith*, 217 Cal. 394, 396; *Potts* v. *Mehrmann*, 50 Cal. App. 622, 626; *Baxter* v. *Baxter*, 19 Cal. App. 238, 239; and *Taylor* v.

*Collins and Taylor*, 299 S. W. (Ky.) 1097. At no place, however, has the petitioner offered any proof or made any argument to show that the debts and fees paid in Jelwan's behalf or that the expenditures for his subsequent support had priority over the indebtedness to the Government herein. Transferee liability having been prima facie established, it is incumbent on petitioner to make such a showing. *Hutton* v. *Commissioner, supra; Estate of L. E. McKnight, supra;* and *Margaret Wilson Baker, supra.* As to priority of claims of the United States, see also *Commonwealth of Massachusetts* v. *United States*, 333 U. S. 611; *Price* v. *United States*, 269 U. S. 492; and *Powers Photo Engraving Co.*, 17 T. C. 393, remanded on another point (C. A. 2), 197 F. 2d 704. Petitioner's claim that she is relieved of liability by reason of the expenditures made by her in Jelwan's behalf is accordingly rejected.

For the proposition that the return of property to Jelwan purged the fraud from the prior transfer thereof to her, to the end that she is no longer liable to the extent of the property so returned, the petitioner quotes from 37 Corpus Juris, Secundum, 1101, 24 American Jurisprudence 263, Wait on Fraudulent Conveyances, section 398, and Bigelow on Fraudulent Conveyances (rev. ed.) 482, and cites and relies on *Roseman* v. *DeHart*, 80 Cal. App. 2d 737; *Taylor* v. *Collins and Taylor, supra; Hughes* v. *Hughes*, 221 S. W. 970, 972; *Martin* v. *Martin*, 150 S. W. 696, 700; *Fulton* v. *McCullough*, 7 N. W. 2d 910; *Cramer* v. *Blood*, 48 N. Y. 684; *Matthews* v. *Buck*, 43 Me. 265, 268; and *McCann* v. *Commissioner*, 87 F. 2d 275, reversing 30 B. T. A. 102. The cases and authorities cited by petitioner appear to support the proposition for which petitioner contends. The respondent makes no argument except to contend that the petitioner's claim as to the money and property returned to Jelwan is likewise defeated by the priority rights of the United States Government as against Jelwan's general creditors. As to the money and property returned to Jelwan, it is our conclusion that petitioner should prevail, and we so hold. As to the retransfers, there was no preferring of any of Jelwan's creditors. Jelwan was not a general creditor, but the original owner of the property in question. The return of the property to him, to the extent of the property so returned, would, in logic at least, leave his creditors, including the United States, in the same position they were in prior to the transfer by him to petitioner. It is, of course, possible that such a retransfer might be the result of collusion between the parties and made in such manner that it also would be in fraud of creditors. Such, however, was not the case in this instance. The retransfers were made in settlement of a suit which was of public record in the California court. We accordingly sustain the petitioner as to the property returned.

*Decision will be entered under Rule 50.*